# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

AWC, INC.        **CASE NO. 6:18-CV-01266**

**VERSUS**         **JUDGE SUMMERHAYS**

**A&B VALVE & PIPING SYSTEMS**  **MAGISTRATE JUDGE HANNA**
**L L C**

---

## MEMORANDUM RULING

---

  The present matters before the court are two motions for summary judgment: (1) Plaintiff AWC, Inc.'s, Motion for Summary Judgment and, in the Alternative Partial Summary Judgment [Doc. 14]; and (2) the Cross-Motion for Summary Judgment filed by the duly appointed Chapter 7 trustee, Elizabeth G. Andrus (the "Trustee"). [Doc. 28]. Also before the court is the Trustee's Motion to Strike. [Doc. 33]. This case was originally filed as an adversary proceeding in the Chapter 7 bankruptcy case of A&B Valve & Piping Systems, L.L.C., Case No. 15-51336 (Adversary No. 16-05002). The Court subsequently withdrew the reference for this adversary proceeding, and the matter was docketed in the District Court as captioned above. As explained below, the court GRANTS AWC's Motion for Summary Judgment [Doc. 14] in its entirety and DENIES the Trustee's Cross-Motion for Summary for Summary Judgment [Doc. 28] and Motion to Strike [Doc. 33].

# I.

# BACKGROUND

## A. The Cheviot Project

The dispute at the heart of this adversary proceeding arises from a contractual relationship between A&B Valve & Piping Systems LLC ("A&B") and AWC, Inc. ("AWC") involving the purchase of valves for an off-shore oil and gas exploration and production project planned for the North Sea. AWC is "a national industrial supplier providing valves, flow controls, instrumentation, and other support and services for the industrial sector." (AWC's Statement of Undisputed Material Facts ("AWC Facts") at ¶ 1 [Doc. 16]). A&B is "a distributor of pipes, valves, and fittings serving a variety of industries including oil and gas, petrochemical, power and other industrial areas." (Trustee's Statement of Undisputed Material Facts ("Trustee's Facts") at ¶ 1 [Doc. 30]). In 2011, A&B was awarded a sub-contract for a production platform that was part of a plan to develop an oil and gas field -- the Cheviot Field -- offshore of the Shetland Islands. (Trustee's Facts at ¶ 2; AWC Facts at ¶ 4). The "Cheviot Project" was owned by ATP Oil. A&B entered into a supply subcontract with Bluewater Industries to supply valves for the project. (Trustee's Facts at ¶ 3). Bluewater provided A&B with the dimensions and specifications for the valves to be used on the project. (*Id.*). The types of valves specified were manufactured by Oliver Valves, Ltd. in the United Kingdom. (*Id.*). According to A&B, "the valves were made-to-order in accordance with Bluewater specifications," but the valves were "of the type ordinarily manufactured by Oliver." (*Id.*). Because AWC was Oliver's exclusive distributor in Louisiana and the Gulf Coast region, A&B negotiated directly with AWC over purchasing the Oliver valves for the Cheviot Project. (*Id.* at ¶ 4).

## B. The Contract Documents

The Summary Judgment record reflects that from March 4, 2011 through July 20, 2011, AWC sent fifteen (15) "quotes" and revised quotes for Oliver valves to A&B. (Index of Exhibits to Joint Stipulation of Certain Facts ("Stipulated Index of Exhibits" at 1-2 [Doc. 46-1])). On July 21, 2011, A&B submitted its first purchase order to AWC. Between July 21, 2011 and May 18, 2012, A&B submitted sixteen (16) purchase orders to AWC as follows:

| PURCHASE ORDER | DATE | AMOUNT |
|---|---|---|
| 736232 | 07/21/11 | $3,660,872.92 |
| 744474 | 11/04/11 | 670,664.00 |
| 745572 | 11/30/11 | 136,246.20 |
| 749507 | 01/10/12 | 35,615.00 |
| 750520 | 01/20/12 | 819,372.40 |
| 752203 | 02/06/12 | 287,727.36 |
| 753462 | 02/17/12 | 931,770.00 |
| 757494 | 04/12/12 | 689,940.32 |
| 757629 | 04/03/12 | 371,636.00 |
| 757801 | 04/04/12 | 12,365.00 |
| 759476 | 04/23/12 | 22,891.28 |
| 759537 | 04/24/12 | 22,891.28 |
| 761779 | 05/11/12 | 49,736.00 |
| 761825 | 05/11/12 | 34,107.00 |
| 762762 | 05/18/12 | 40,248.24 |
| 762763 | 05/18/12 | 2,456.00 |
|  |  |  |
| **TOTAL** |  | **$7,788,539.00** |

Twelve (12) of A&B's sixteen (16) purchase orders were submitted after AWC submitted quotes and revised quotes to A&B. (Stipulated Index of Exhibits at 1-19). Three (3) of A&B's purchase orders – purchase order numbers 744474, 757801, and 762763 -- were submitted by A&B before

receiving a quote from AWC. (*Id.*) With respect to one A&B purchase order -- No. 759537 -- there is no associated AWC quote in the record. (*Id.*)

The parties' dispute centers on the cancellation terms in their contract documents. Of the twelve purchase orders that were preceded by an AWC quote, six (6) of the AWC quotes contained language addressing cancellation. With respect to the *other* six purchase orders preceded by AWC quotes, the quotes did not contain any terms addressing cancellation. Even where the AWC quotes contained cancellation terms, the terms differed. For purchase order numbers 736232 and 752203, AWC's quotes contained the following cancellation language ("Version 1"):

> CANCELLATION: Any cancellation would have to be by prior agreement and include costs for all work under taken to the time of Termination/Cancellation/Suspension and the applicable profits. Cancellation terms are as follows: Should unforeseen circumstances arise, and the option of cancellation/termination is invoked, we propose the following milestones, relating to the payment status of any contract; After 1 week Administration charge of 5% of Contract Purchase price; 2-4 weeks 20% of Contract Purchase price; 4-6 weeks 40% of Contract Purchase price; 6-8 weeks 60% of Contract Purchase price; 8-10 weeks 50% of Contract Purchase price; Above 10 weeks 100% of Contract Purchase price. NOTE: The percentage figures detailed are relevant to ordered items only and do not include carriage, packing, or ancillary items.

With respect to Purchase order numbers 749507, 757494, 757629, and 750520, AWC's quotes contained the following cancellation language ("Version 2") that omits the cancellation fee schedule in Version 1:

> CANCELLATION CHARGES: Any cancellation would have to be by prior agreement and include costs for all work under taken to the time of Termination/Cancellation/Suspension and the applicable profits. NOTE: The percentage figures detailed are relevant to Ordered items only and do not include carriage, packing, or ancillary items.

The A&B purchase orders and AWC invoices generally did not contain separate language dealing with cancellation or remedies. However, AWC submitted a separate "order

acknowledgement" in connection with purchase order numbers 752203 and 750520. (Stipulated

Index of Exhibits at 3,7). These two order acknowledgements contain the following language:

"Material subject to a minimum 15% restocking charge if returned." (*Id*.). The parties also referred

to AWC's and A&B's "standard terms and conditions" posted on their respective websites. A&B's

purchase orders specifically reference its "standard terms and conditions as a purchaser" (A&B's

"Standard Terms and Conditions") by listing the website address for these terms and conditions.

(*See, e.g.*, Joint Stipulation of Certain Facts in Support of Supplemental Brief to Motion for

Summary Judgment ("Joint Stipulation") Exhibit 2 at 1 [Doc. 46]). Paragraph 15 of A&B's

Standard Terms and Conditions includes a general provision on termination:

> Termination: Buyer [i.e. A&B] may at any time, without cause,
> terminate this Purchase Order in whole or in part upon written notice
> to Seller. In such event, Seller shall be entitled to a reasonable
> termination fee consisting of a percentage of the Purchase Order
> price reflecting the percentage of the work, goods delivered or
> services properly performed prior to termination. Payment of such
> termination fee shall be Seller's sole remedy. Upon Buyer's request,
> Seller shall preserve, protect and deliver to Buyer, at Buyer's
> expense, materials on hand, work in progress, and completed work,
> both in its own and in its supplier's plants.

The parties also reference AWC's standard terms and conditions (AWC's "Standard Terms and

Conditions"), and A&B concedes that it never objected to AWC's Standard Terms and Conditions.

(*See* Trustee's Memorandum in Support of Cross-Motion for Summary Judgment ("Trustee's

Cross Motion Memorandum" at 8 [Doc. 29]). Paragraph 6 of AWC's Standard Terms and

Conditions states:

> Returns, change orders and cancellations will be accepted only upon
> written approval by Seller, and all returns will be at Buyer's sole
> expense, freight prepaid. Seller will not accept returns after 90 days
> following delivery. Returned items, and items cancelled within
> fifteen (15) days prior to scheduled delivery, may be subject to a
> minimum restocking charge of 15% of the Purchase Price, and
> change orders for modification of specification or delivery schedule

shall be subject to reasonable charge for reimbursement of Seller's cost in connection therewith. Nonstock and custom items are not returnable.

Paragraph 1 of AWC's Standard Terms and Conditions further states that "acceptance by seller [AWC] of any order is expressly conditioned upon agreement by buyer [A&B] to the terms and conditions hereof. Acceptance by buyer…constitutes acknowledgment and agreement by buyer that the terms and conditions hereof supersede contrary provisions of any purchase order."

### C.  A&B Requests That AWC Suspend Pending Orders

On July 5, 2012, A&B requested that AWC suspend all pending orders. (AWC Facts ¶32). When AWC responded that the orders could not be cancelled, A&B instructed AWC to "put all open Cheviot orders on hold." (*Id.*). On July 10, 2012, A&B informed AWC that the Cheviot Project had been suspended and inquired what the "cancellation charges will be." (*Id.*). AWC ultimately provided A&B with a breakdown of cancellation charges that was consistent with Version 1 of the cancellation schedule contained in its quotes to purchase orders 736232 and 752203. (*Id.*). The cancellation fee remained unpaid. ATP, the owner of the Cheviot Project, ultimately filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Texas.

In August 2012, A&B filed a state court lawsuit in the 33rd Judicial District, Harris County, Texas, seeking a temporary injunction to restrain AWC from drawing on a letter of credit issued by PNC Bank in connection with the Cheviot Project transaction.[1]   The parties resolved the Texas lawsuit with a partial settlement agreement that allowed AWC to draw $500,000.00 from the letter of credit plus an additional $500,000.00 paid by A&B Valve to AWC based on A&B Valve's anticipated receipt of payment from the bankruptcy estate of ATP.  (AWC Facts ¶¶ 38, 39; Exhibits

---

[1] This Texas case was styled as *A&B Valve Piping Systems, LLC v. AWC, Inc., and PNC Bank*, N.A., Case No. 2012-47405, 33rd Judicial District, Harris County, Texas.

26). In that settlement agreement, the parties agreed to reserve their rights with respect to any cancellation charges owed by A&B. (Ttrustee's Facts ¶ 30). The partial settlement agreement also provided that AWC could cancel pending purchase orders for the Cheviot Project if A&B did not lift the suspension on the orders by December 31, 2012. (AWC Facts at ¶¶ 38, 39.) AWC ultimately cancelled the orders. (*Id.* at ¶ 39). The partial settlement agreement further provided that "A&B agrees to reimburse AWC any and all storage charges and restart…it is required to pay Oliver resulting from the delay or cancellation or Project regardless of whether the project is continued or cancelled." (*Id.*).

At the time of the cancellation, the total value of the purchase orders from A&B to AWC on the Cheviot Project totaled $7,788,539.44. Of this amount, $3,742,315.76 of valves was shipped to A&B prior to the July 10th suspension. Of the remaining undelivered valves, $4,046,223.68 was either complete and ready to ship, waiting on customer testing or inspection, ready for build assembly, or were in some other stage in the manufacturing process. (AWC Facts ¶33). As far as payments on the sixteen purchase orders, A&B paid $5,081,616.81 not counting the amounts paid pursuant to the 2012 partial settlement. The parties' summary judgment submissions allocate A&B's payments, AWC's shipments, and the remaining undelivered products by purchase order number:

| A&B Valve Purchase Order Number | Purchase Order Value | A&B Valve Payments | AWC Shipments | Complete & Ready to Ship | Waiting on Customer Testing or Inspection | Ready for Build Assembly | Other Status |
|---|---|---|---|---|---|---|---|
| 736232 | $3,660,872.92 | $3,281.360.63 | $3,618,926.92 | $ 41,946.00 | $ - | $ - | $ - |
| 744474 | 670,664.00 | 335,332.00 | - | 331,062.00 | 42,336.00 | 289,766.00 | 7,500.00 |
| 745572 | 136,246.20 | 66,469.50 | 3,307.20 | 1,530.00 | 49,452.00 | - | 81,957.00 |
| 749507 | 35,615.00 | 17,807.50 | 35,615.00 | - | - | - | - |
| 750520 | 819,372.40 | 409,686.20 | 69,508.40 | 2,500.00 | 180,282.00 | 256,870.00 | 310,212.00 |
| 752203 | 287,727.36 | 143,863.68 | 2,369.36 | 1,500.00 | 156,385.00 | 123,473.00 | 4,000.00 |
| 753462 | 931,770.00 | 444,963.50 | - | - | - | 900,025.00 | 31,745.00 |
| 757494 | 689,940.32 | 344,970.16 | 2,850.32 | - | - | 646,573.00 | 40,517.00 |
| 757629 | 371,636.44 | 37,163.64 | 4,685.76 | 1,875.00 | 21,243.00 | 340,832.68 | 3,000.00 |
| 757801 | 12,365.00 | | | - | - | 11,865.00 | 500.00 |
| 759476 | 22,891.28 | - | 1,081.28 | - | - | - | 21,810.00 |
| 759537 | 22,891.28 | - | 1,081.28 | - | - | - | 21,810.00 |
| 761779 | 49,736.00 | - | 1,848.00 | - | - | 46,513.00 | 1,375.00 |
| 761825 | 34,107.00 | - | - | - | - | 32,232.00 | 1,875.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 762762 | 40,248.24 | - | 1,042.24 | - | - | 36,831.00 | 2,375.00 |
| 762763 | 2,456.00 | - | - | - | - | 1,831.00 | 625.00 |
| | | | | | | | |
| **TOTAL** | **$7,788,539.44** | **$5,081,616.81** | **$3,742,315.76** | **$ 380,413.00** | **$ 449,698.00** | **$2,686,811.68** | **$ 529,301.00** |

On October 17, 2013, AWC filed suit in the 15th Judicial District Court in Lafayette Parish, Louisiana, styled *AWC, Inc. v. A&B Valve and Piping Systems, LLC*, C-20135329 [Doc. 2]. AWC subsequently filed an amended petition in that case, and A&B filed an answer and reconventional demand. [*Id*.] In the 15th JDC case, AWC sought recovery of the remaining value of the sixteen purchase orders that A&B had not paid. This outstanding balance, according to AWC, represented valves that had been ordered but never delivered because of A&B's suspension request. According to AWC, this remaining balance was non-refundable. [*Id*.]. A&B, however, asserted in its answer and reconventional demand that it was not liable for the remaining balance on the purchase orders. Moreover, A&B asserted that it was entitled to a refund of the amounts it had paid for product that was never shipped to it at the time it instructed AWC to suspend any remaining orders.

After the July 10th suspension request, Oliver demanded that the undelivered valves be removed from its facilities. (AWC Facts ¶ 60). Oliver ultimately billed AWC for storage costs totaling $132,000.00 for the period September 2012 through December 2013. (AWC Facts at ¶¶57, 59). Oliver also agreed to buy the remaining undelivered valves for scrap. (*Id*.). In 2014, A&B and AWC entered into another partial settlement in which A&B agreed to cooperate in the sale of the remaining undelivered valves to Oliver for $249,380.29, which represented its scrap value. (AWC Facts ¶¶ 61-62).

On October 16, 2015, A&B filed for relief under Chapter 11 of the Bankruptcy Code in the Lafayette Division of the Western District of Louisiana, Case No. 15-51336. On February 5, 2016, the case was converted to a case under Chapter 7, and Elizabeth G. Andrus was duly appointed as the Chapter 7 Trustee. Prior to conversion, on January 14, 2016, A&B removed AWC's 15th JDC case to bankruptcy court under 28 USC 1452(a) based on bankruptcy court jurisdiction under 28

USC 1334(b).  The removed case was assigned an adversary proceeding number in the bankruptcy case, Adversary No. 16-05002.  Both AWC and A&B subsequently filed cross-motions for summary judgment, which were argued before the bankruptcy court.  On September 25, 2018, the district court withdrew the reference for this adversary proceeding.

## II.

### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010). As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty.*

*Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.

## MOTION TO STRIKE

The Court first addresses the Trustee's Motion to Strike [Doc. 33]. The Trustee requests that the court strike four supplemental exhibits filed by AWC [Doc. 19, 32]. The Trustee posits two arguments for striking these exhibits: (1) the exhibits are untimely to the extent that they were filed after AWC filed its statement of undisputed facts with supporting exhibits, and (2) the exhibits are not relevant to the issues raised in the motions for summary judgment. With respect to timeliness, the Court agrees with AWC that these documents were filed not in support of AWC's motion, but in response to the Trustee's undisputed facts filed in support of her Cross-Motion for Summary Judgment. One of the cases cited by the Trustee, *Lopez v. Laborors Int'l Union Local No. 18*, 987 F.2d. 1210 (5th Cir. 1993), recognizes a trial court's broad discretion in allowing or excluding summary judgment evidence. Here, even if AWC's exhibits could be deemed to be untimely, the Court finds that the parties had ample opportunity to address the evidence in the summary judgment record.

With respect to relevancy, AWC contends that the supplemental exhibits challenged by the Trustee were filed to address statements in the Trustee's statement of undisputed facts. The Court agrees with AWC that there are no grounds to exclude these exhibits in light of the Trustee's cross-motion for summary judgment and her statement of undisputed facts. Moreover, to the extent that these exhibits pertain to the relationship between AWC and Oliver as well as Oliver's agreement to purchase valves that were never delivered to A&B after the July 10, 2012 suspension request, these documents are relevant to the parties' dispute over whether AWC is entitled to a "reasonable" cancellation fee as well as mitigation of damages. Accordingly, the Trustee's Motion to Strike [Doc. 33] is DENIED.

## IV.

## ANALYSIS

### A. What was the Nature of the Parties' Contractual Relationship?

This case represents a classic "battle of the forms" scenario.[2] The parties dispute not only the nature of their contractual relationship -- i.e. whether the parties formed a single contract governing the entire project or multiple contracts formed with each purchase order -- but also the identity of the controlling contract documents and the meaning of the terms and conditions contained in those documents. The Court must look to Louisiana law for the choice of law analysis in a diversity case. *Klaxon Co. v. Stentor Electric Co.*, 313 U.S. 487 (1941). Neither the Trustee nor AWC disputes that Louisiana law applies to their contract claims. Questions of contractual interpretation are questions of law. *Ratcliff Development, LLC v. Ollie Lee Corp.*, 155 So. 2d. 698, 700 (La. App. 3 Cir. 1/7/15). The words of a contract should be construed according to the "common intent of the parties." *Id.* (Citing La. Civ. Code Arts. 183, 245). The Louisiana Civil

---

[2] *See* N. Stephen Kinsella, *Smashing the Broken Mirror: The Battle of the Forms, UCC 2-207, and Louisiana's Improvements*, 53 La. L.Rev. 1555, 1556 (1993).

Code recognizes that a contract "is formed by the consent of the parties established through offer and acceptance." La. Civ. Code Art. 1927. The terms of the offer and acceptance define the contracting parties' agreement:

> An expression of acceptance of an offer to sell a movable thing suffices to form a contract of sale if there is agreement on the thing and the price, even though the acceptance contains terms additional to, or different from, the terms of the offer, unless acceptance is made conditional on the offeror's acceptance of the additional or different terms. Where the acceptance is not so conditioned, the additional or different terms are regarded as proposals for modification and must be accepted by the offeror in order to become a part of the contract.

> Between merchants, however, additional terms become part of the contract unless they alter the offer materially, or the offer expressly limits the acceptance to the terms of the offer, or the offeree is notified of the offeror's objection to the additional terms within a reasonable time, in all of which cases the additional terms do not become a part of the contract. Additional terms alter the offer materially when their nature is such that is must be presumed that the offeror would not have contracted on those terms.

La. Civ. Code Art. 2601. Article 2601 governs when additional terms in an acceptance can become part of the parties' contract and establishes the default rule for merchants that additional terms become part of the contract. Article 2601 is based on Uniform Commercial Code ("UCC") Section 2-207 but restricts the governing contract documents to the offer and the acceptance. *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, 2010 WL 892869 at * 5 (W.D. La. March 11, 2010). In contrast, UCC Section 2-207 provides that additional terms in "written confirmations" may become part of the contract. *Id.* Article 2601 "omits the reference to confirmations, and, assuming its other conditions are met, allows additional terms to become part of a contract *only* if they are included in an actual acceptance." *Id.* (emphasis in original); Kinscella, 53 La. L. Rev. 1556.

Here, AWC and the Trustee dispute which documents constitute the "offer" and the "acceptance." AWC characterizes the original set of AWC quotes sent to A&B as the offer,[3] and argues that A&B accepted that offer through its sixteen purchase orders. (AWC's Motion for Summary Judgment at 10-12). In AWC's view, the parties' relationship is essentially governed by a single contract that governs all orders relating to the Cheviot Project. As a result, the terms set forth in AWC's original quotes carry forward and apply to every purchase order. In sum, according to AWC, the same terms apply to every order by A&B, and those terms are defined by the original quotes sent by AWC.

The Trustee, on the other hand, argues that AWC's original quotes were merely proposals, not offers intended to create a contract (or multiple contracts) when A&B submitted its purchase orders. Unlike AWC, the Trustee views the parties' relationship as a series of sixteen individual contracts with each A&B purchase order serving as the offer and AWC's invoice or written confirmation as the acceptance. The Trustee does not view any of the AWC quotes preceding A&B's purchase orders as "offers" within the meaning of Civil Code Article 2601. Accordingly, under Article 2601, the terms of each of the parties' sixteen contracts, according to the Trustee, are defined by the respective A&B purchase order and the AWC invoice/confirmation.

The parties' correspondence does not support AWC's characterization of a single contract governing the parties' entire relationship. AWC's initial quotes with its proposed cancellation terms (which preceded A&B's first purchase order) do not appear to have been adopted by the parties as a "master contract" governing all sixteen of A&B's purchase orders issued in connection with the Cheviot Project. All but four of A&B's purchase orders were preceded by *separate* AWC quotes. Importantly, the cancellation terms contained in these later AWC quotes differed from the

---

[3] Index of Stipulated Facts at 1 - 3.

initial quotes. (*See* Stipulated Index of Exhibits at 1-19). It does not appear from this correspondence that a single AWC quote or proposal was intended by the parties to govern their entire contractual relationship. AWC points to language in several (but by no means all) of A&B's purchase orders that state "all the same specifications, testing, etc. apply as per original order 736232." (*See* Stipulated Index of Exhibits at 16-18). But these references to the first A&B purchase order do not specifically reference cancellation terms or remedies upon cancellation. Similarly, AWC's reliance on the deposition testimony of Jorge Diaz, A&B's President, does not support its argument that a single set of terms and conditions governed the parties' entire relationship. Rather, Mr. Diaz merely testified that A&B, in general, did not intend to have separate or different terms and conditions applied to each of its purchase orders. (AWC Facts ¶ 28). His testimony makes no reference to any specific terms or conditions, must less cancellation terms and remedies upon cancellation. (*Id.*). In sum, the parties' relationship with respect to the Cheviot Project consisted of sixteen related, but separate, contracts defined by the terms and conditions contained in the offer and acceptance for each contract. As further explained below, this does not mean that each contract must be construed independently with a blind eye to the parties' other related contracts and the parties' course of performance. To do so would be inconsistent with the Civil Code. *See, e.g.,* La. Civ. Code art. 2053.

Turning to the Trustee's characterization of the contract documents, the Court does not agree with the Trustee that the contract documents for each sale consist of A&B's purchase order and the AWC invoice or purchase confirmation sent in response to the purchase order. With respect to the AWC quotes preceding all but four of A&B's sixteen purchase orders, the Trustee characterizes these quotes as merely *proposals* and not offers capable of acceptance under article 2601 of the Civil Code. (Index of Stipulated Facts at 1-19; Trustee's Memorandum in Support of

Cross-Motion at 7-8). However, under Louisiana law, a price list sent upon request to a customer is an offer that forms a contract when the customer accepts the offer by placing a purchase order. *North Louisiana Milk, etc. v. Southland Corp.*, 352 So.2d. 293, 296 (2d. Cir. La. App. 1977), *citing* Litvinoff, *Obligations* 6 La. Civ. L. Treatise Section 130, pp. 211-13 (1969)). Here, AWC's quotes contain more detail than a mere price quote, including proposed cancellation language and a cancellation schedule as well as other proposed terms and conditions. (*See, e.g.,* Joint Stipulation, Exhibits 1-16). When A&B submitted its purchase order in response to AWC's quote, a contract was formed and that contract was governed by the terms and conditions in the AWC quote and the A&B purchase order. The district court and the circuit court addressed a similar question in *Gulf South Mach., Inc. v. Kearney & Trucker Corp.,* 756 F.2d. 377, 380 (5ᵗʰ Cir. 1985) (Pditz, J.). A customer sent a quote and proposal at the customer's request. *Id.* The customer responded with a purchaser order for the product and the seller then sent an acknowledgment to the customer. *Id.* As in this case, the seller's initial proposal included not only a price list but other terms of sale, such as shipping requirements. *Id.* Moreover, as here, the parties in *Gulf South* disputed whether the seller's initial proposal or the buyer's purchase order was the offer. The district court concluded that the buyer's purchase order was the offer and the seller's acknowledgment was the acceptance. *Id.* The Fifth Circuit disagreed, concluding that the seller's initial proposal was an offer that was accepted by the buyer's purchase order. Those two documents were thus the relevant contract documents, not the purchase order and seller's acknowledgment. *Id.*

Applying the analysis of *Gulf South* to this case, AWC's quotes were offers with respect to the twelve transactions where the quotes preceded A&B's purchase orders. A&B accepted these offers by issuing purchase orders. The parties' rights and obligations for each contract was defined by the terms contained in these documents, not any subsequent documents like AWC's invoices

or confirmations. *See Gulf South Mach., Inc.,* 756 F.2d. at 380; *Hollybrook Cottonseed,* 2010, WL 892869 at *5. For the remaining four transactions where there was either no quote or A&B's purchase order preceded an AWC quote, the purchase order was the offer and AWC's invoice or order acknowledgement was the acceptance. In those cases, the parties' contract terms were defined by these documents. *Id.*

### B. What Cancellation Terms Apply?

Turning to the parties' dispute over cancellation terms, the sixteen contracts can be broken down into three categories:

(1) The two contracts formed by purchase order numbers 736232 and 752203 that are subject to Version 1 of the cancellation language contained in AWC's quotes;

(2) The contracts formed by purchase order numbers 749507, 750520, 757494, and 757629 that are subject to Version 2 of the cancellation language in AWC's quotes; and

(3) The ten contracts where the initial AWC quotes lacked any cancellation terms (Purchase Order Nos. 745572, 753462, 759476, 761779, 761825, and 762762) or relevant contract documents do not include an AWC quote (Purchase Order Nos. 744474, 757801, 759537, and 762763).

### 1. The First Category: Contracts Formed By Purchase Order Nos. 736232 and 752203

The two contracts formed by A&B purchase order numbers 736232 and 752203 are governed by Version 1 of AWC's cancellation clause, which states:

> CANCELLATION: Any cancellation would have to be by prior agreement and include costs for all work under taken to the time of Termination/Cancellation/Suspension and the applicable profits. Cancellation terms are as follows: Should unforeseen circumstances arise, and the option of cancellation/termination is invoked, we propose the following milestones, relating to the payment status of any contract; After 1 week Administration charge of 5% of Contract

> Purchase price; 2-4 weeks 20% of Contract Purchase price; 4-6
> weeks 40% of Contract Purchase price; 6-8 weeks 60% of Contract
> Purchase price; 8-10 weeks 50% of Contract Purchase price; Above
> 10 weeks 100% of Contract Purchase price. NOTE: The percentage
> figures detailed are relevant to ordered items only and do not include
> carriage, packing, or ancillary items.

(Joint Stipulation Exhibits 1, 6). This provision provides a schedule for payments upon cancellation with a proposed 100% cancellation fee ten weeks after an order. The Trustee's argument to the contrary, this schedule was included in two quotes that were valid offers and that were accepted by these two A& B purchase orders[4]. These cancellations terms are, therefore, applicable to the valves that had not been delivered at the time A&B requested a suspension of its orders. As explained above, these two quotes qualified as offers sufficient to form a contract when A&B accepted with its purchase orders. As of A&B's July 10, 2012 request to suspend pending orders, **$327,304** of the product ordered through purchase order numbers 736232 and 752203 remained undelivered and A&B's suspension request occurred more than ten weeks after the purchase orders were submitted:

| A&B Valve Purchase Order Number | Complete & Ready to Ship | Waiting on Customer Testing or Inspection | Ready for Build Assembly | Other Status | Total |
|---|---|---|---|---|---|
| 736232 | $ 41,946.00 | $ - | $ - | $ - | |
| 752203 | 1,500.00 | 156,385.00 | 123,473.00 | 4,000.00 | |
| | | | | | |
| TOTAL | $ 43,446.00 | $ 156,385.00 | $ 123,473.00 | $ 4,000.00 | $ 327,304.00 |

---

[4] The Trustee contends in her memorandum that this cancellation schedule "was neither accepted by A&B Valve nor included in any contract documentation evidencing AWC's acceptance of the A&B Valve orders." (Trustee's Memorandum in Support of Cross-Motion for Summary Judgment). To the contrary, A&B *did accept* this schedule with respect to these two contracts by submitting purchase orders. Louisiana law does not require an acceptance to specifically reference, and individually accept, each specific term of the offer. The purchase order was sufficient to constitute an acceptance of all terms in AWC's quote. *See Gulf South*, 756 F.2d at 380.

Accordingly, under the cancellation language applicable to these contracts, AWC was entitled to a 100% cancellation fee.[5]

The Standard Terms and Conditions referenced in A&B's purchase orders do not change this result. All of A&B purchase orders contain a form reference to the "standard terms and conditions" enumerated on A&B's website. Under Louisiana law, the terms of the parties' contract are defined by the documents that make up the offer and acceptance. However, the terms of the contract also include any terms and conditions in other documents referenced by the offer or the acceptance. *See L&A Contracting Co., Inc. v. Ram Indus. Codings, Inc.*, 762 So.2d 1223, 1234 (La. App. 1 Cir. 6/23/00) ("As a general rule of contract law, separate documents may be incorporated into a contract by attachment or reference thereto."); *AWC, Inc. v. CSF Constr., Inc.*, 931 So.2d 382, 386 (La. App. 4 Cir. 4/26/06) (same). These additional terms and conditions referenced in A&B's purchase orders could become part of the parties' contract as "additional terms in an acceptance" under article 2601 of the Civil Code. That provision states that "between merchants…additional terms become part of the contract unless they alter the offer materially, or the offer expressly limits the acceptance to the terms of the offer, or the offeree is notified of the offeror's objection to the additional terms within a reasonable time, in all of which cases the additional terms do not become part of the contract." La. Civ. Code Article 2601. Here, there is no dispute that A&B and AWC are merchants with respect to the products covered by these contracts. Accordingly, any additional terms contained in A&B's purchase orders became part of

---

[5] Both parties address language in the correspondence--specifically AWC's order acknowledgements--stating that custom items were "not returnable." (*See,* e.g., AWC Facts at ¶22). The Trustee contends that this provision does not apply to the remaining undelivered goods because they were never in A&B's possession and, therefore, could not be returned. AWC relies on an argument that, because the parties' shipment term was "ex ship," title had passed and A&B was capable of "returning" the goods. The Court need not resolve this dispute. First, this return language in AWC's acknowledgement is not part of the parties' contract documents. Second, even if it was, the Court's application of the cancellation fee is not affected by the return language. The fee provisions are independent of and unmodified by that language.

the parties' contract unless they fell within one of the exceptions enumerated in article 2601 of the Civil Code.

A&B's Standard Terms and Conditions address cancellation, but they do not nullify the cancellation charges set forth in AWC's quotes. These Standard Terms and Conditions state that A&B has the right to terminate any order without cause upon written notice to AWC. (AWC Facts, Exhibit 37). This provision, however, provides that AWC would be "entitled to a reasonable termination fee consisting of a percentage of the Purchase Order price reflecting the percentage of work, goods delivered or services property performed prior to termination." (*Id.*) This standardized language does not define a "reasonable termination fee" nor does it detail how to calculate a fee based on the "percentage of work, goods delivered or services properly performed" in the context of the Cheviot Project and the contracts created by A&B and AWC.

Each "provision in a contract must be interpreted in light of the provisions [of the contract] so that each is given the meaning suggested by the contract as a whole" and the provisions of a contract should be harmonized if possible and not given a construction that renders a provision ineffective. *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 112 So. 3d. 187, 192, 194 (La. 3/19/13). Here, the cancellation terms and schedule in AWC's quotes were tailored to the parties' dealings in connection with the Cheviot Project. In contrast, the cancellation clause in A&B's standard terms and conditions is standardized language; it is framed to apply to *any* contract in which A&B is a purchaser regardless of the product involved or the nature of the transaction. Given that A&B never addressed or objected to AWC's termination clause and schedule, the "reasonable cancellation fee" referenced in A&B's Standard Terms and Conditions is not inconsistent with, nor does it negate the termination fee schedule set forth in AWC's quotes. A "reasonable" cancellation fee could well be the 5 – 100% cancellation fee provided in AWC's

cancellation fee schedule. Accordingly, since these provisions can be harmonized, AWC's cancellation clause and schedule apply to these two contracts.

### 2. The Second Category: Contracts Formed by Purchase Order Nos. 749507, 750520, 757494, and 757629

The contracts created by purchase order numbers 749507, 750520, 757494, and 757629 include Version 2 of the cancellation language in AWC's quotes. Of the products ordered in these four contracts, **$1,803,904.68** of product had not been shipped to A&B at the time A&B requested a stand down in the delivery of any pending orders:

| A&B Valve Purchase Order Number | Complete & Ready to Ship | Waiting on Customer Testing or Inspection | Ready for Build Assembly | Other Status | Total |
|---|---|---|---|---|---|
| 749507 | - | - | - | - | |
| 750520 | $ 2,500.00 | $ 180,282.00 | $ 256,870.00 | $ 310,212.00 | |
| 757494 | - | - | 646,573.00 | 40,517.00 | |
| 757629 | 1,875.00 | 21,243.00 | 340,832.68 | 3,000.00 | |
| | | | | | |
| TOTAL | $ 4,375.00 | $ 201,525.00 | $1,244,275.68 | $ 353,729.00 | $1,803,904.68 |

Version 2 of AWC's cancellation provision does not include the cancellation fee schedule in Version 1, but does include the same language from Version 1 with respect to cancellation charges: "Any cancellation would have to be by prior arrangement and include cost for all work undertaken to the time of Termination/Cancellation/Suspension and the applicable profits." Version 2 also appears to reference the schedule of cancellation charges in Version 1 by stating "the percentage figures detailed are relevant to ordered items only and do not include carriage, packing, or ancillary items." This is the same language that follows the detailed cancellation schedule in Version 1 of AWC's cancellation clause. A&B's four purchase orders accepting AWC's quotes include the same general reference to A&B's Standard Terms and Conditions contained on its website, which includes the standardized cancellation provisions previously discussed.

The contract documents for these four transactions supports AWC's position that it is entitled to payment for all of the product ordered in these transactions but not shipped at the time that A&B requested that AWC suspend the current pending orders in July 2012. AWC's quotes specifically refer to the "costs for all work undertaken" at the time of the suspension *as well as* the "applicable profits." This reference to costs and profits of the products ordered indicates an intent that AWC would be entitled to collect the full *purchase price* (i.e., cost plus profits on the product ordered), for the work undertaken at the time of the suspension. The summary judgment record shows that work on the product ordered by these four purchase orders had been "undertaken" at the time of A&B's requested suspension. (See Stipulated Index at Exhibits at 1-19; AWC Facts ¶ 33).

This reading of the cancellation terms is consistent with the cancellation schedule included in the contract documents for purchase order numbers 736232 and 752203. The court agrees with A&B that the contracts formed by purchase order numbers 749507, 750520, 757494, and 757629 do not include this specific schedule and the schedule is, therefore, not an express term of these contracts. However, Louisiana law requires that a court construe multiple related contracts consistently: "a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract *and of other contracts of a like nature between the same parties*." La. Civ. Code Article 2053 (emphasis added). Here, the cancellation fee language of Version 2 is consistent with the cancellation fee schedule in Version 1 of AWC's termination provision in that A&B would be responsible for 100% of the contract price for the product ordered through these four purchase orders. The four purchase orders were issued more than ten weeks before A&B's suspension request in July 2012.[6]

---

[6] As with the first category of contracts, the contract documents include a reference to A&B's Standard Terms and Conditions on its website. However, like the first category of contracts, the court concludes that the additional terms

### 3. The Third Category: Contracts Formed By Purchase Order Nos. 744474, 745572, 753462, 757801, 759476, 759537, 761779, 761825, 762762, and 762763

The third category of contracts formed by purchase order numbers 744474, 745572, 753462, 757801, 759476, 759537, 761779, 761825, 762762, and 762763 do not include any AWC cancellation terms. Either the AWC quote omitted cancellation language or the contract documents consist of A&B's purchase order and AWC's invoice or order confirmation because there was no AWC quote or the quote was sent after the purchase order. These ten contracts cover **$1,915,015** of product that had not been shipped at the time of the July 2012 suspension:

| A&B Valve Purchase Order Number | Complete & Ready to Ship | Waiting on Customer Testing or Inspection | Ready for Build Assembly | Other Status | Total |
|---|---|---|---|---|---|
| 744474 | $ 331,062.00 | $ 42,336.00 | $ 289,766.00 | $ 7,500.00 | |
| 745572 | 1,530.00 | 49,452.00 | - | 81,957.00 | |
| 753462 | - | - | 900,025.00 | 31,745.00 | |
| 757801 | - | - | 11,865.00 | 500.00 | |
| 759476 | - | - | - | 21,810.00 | |
| 759537 | - | - | - | 21,810.00 | |
| 761779 | - | - | 46,513.00 | 1,375.00 | |
| 761825 | - | - | 32,232.00 | 1,875.00 | |
| 762762 | - | - | 36,831.00 | 2,375.00 | |
| 762763 | - | - | 1,831.00 | 625.00 | |
| | | | | | |
| **TOTAL** | $ 332,592.00 | $ 91,788.00 | $1,319,063.00 | $ 171,572.00 | **$1,915,015.00** |

The cancellation provisions in A&B's Standard Terms and Conditions differ from AWC's cancellation provisions in that they allow cancellation without cause subject to a "reasonable termination fee." This provision refers to "a percentage of the purchase order price reflecting the percentage of the work, goods delivered or services properly performed prior to termination." (Joint Stipulation, Exhibit 2 at 1 [Doc. 46]). As already noted, this language in A&B's Standard Terms and Conditions was not tailored to apply to the circumstances of the Cheviot Project and

---

of the standardized terms and conditions does not eliminate the requirement that A&B pay 100% cancellation fee for work undertaken at the time of the suspension.

does not define a "reasonable" termination fee or how to calculate the "percentage of the work, goods delivered or services" performed prior to termination. (*Id*.).

The Court concludes that the reference to a "reasonable termination fee" in A&B's Standard Terms and Conditions must be construed in light of the cancellation provisions incorporated in the parties' other contracts, including Versions 1 and 2 of AWC's cancellation language and the cancellation schedule adopted by the parties in two of their contracts. A&B never rejected or objected to these provisions. Under these circumstances, AWC's cancellation fee schedule provides a standard for defining a "reasonable" termination fee within the meaning of A&B's Standard Terms and Conditions for at least three reasons.

First, this reading of A&B's cancellation provision is consistent with the Civil Codes' rules for interpreting related contracts. Under Civil Code Article 2053, the contracts containing Versions 1 and 2 of AWC's termination language as well as AWC's cancellation fee schedule are "other contracts of a like nature between the same parties" and their terms should therefore be considered in construing the meaning of the instant ten contracts. La. Civ. Code art. 2053.

Second, a cancellation fee that ranges up to 100%, as provided in AWC's cancellation fee schedule, is reasonable because of the nature of the goods involved: valves manufactured by Oliver to meet the unique specifications of the Cheviot Project. The Trustee argues that the Oliver's valves were not "custom" goods because they are the valves that Oliver normally produces. This argument defies the plain and ordinary meaning of the term "custom goods." A custom product is a product "made … according to personal order usually to individual specifications,"[7] which is precisely what occurred with the Oliver valves ordered for the Cheviot Project: they were manufactured by Oliver specifically for A&B and the Cheviot Project based on specifications unique to that project.

---

[7] *Custom*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981)

Accordingly, as the undisputed facts show, the undelivered valves that were complete or at some stage of the manufacturing process at the time that A&B requested a suspension in deliveries were ultimately sold for scrap with the approval of A&B. (AWC Facts ¶¶ 61-62). AWC shows that it was obligated to pay Oliver for the valves regardless of A&B's hold or the status of the Cheviot Project, and A&B offers nothing to dispute that fact. (AWC's Facts ¶ 48). Under these circumstances, a "reasonable" termination fee is consistent with the termination schedule in AWC's initial quotes even if it results in a 100% terminational fee.

Third, *A&B's* termination provision refers to a percentage of the "purchase order price" reflecting work performed and goods delivered prior to termination. As noted above, the summary judgment record reflects that the work on the product covered by the purchase orders for these ten contracts had been undertaken prior to the July 2012 suspension.

Applying the termination schedule to these contracts, **$1,791,358** of the undelivered valves were ordered more than 10 weeks prior to July 10, 2012. AWC is entitled to a 100% cancellation fee as a reasonable termination fee. The remaining $123,657 covered by A&B purchase order numbers 761779, 761825, 762762, and 762763 were ordered approximately 8 weeks prior to July 10, 2012, and thus subject to a 50% cancellation fee under the cancellation schedule. This amount totals **$61,828.50**. [8]

---

[8] AWC argues that the "50%" cancellation fee for cancellations within 8 weeks was a "typo" and it should read "80%." In that regard, AWC offers the affidavit testimony of J. David Honeycutt that the 50% figure is a typo. (AWC Facts at ¶18). This figure in the schedule may well be a typo, but it is not so manifestly clear from the text of the schedule and the conduct of the parties that the Court can re-write the terms of the parties' agreements by correcting an apparent typo. The parties' relationship spanned 16 distinct contracts, 12 of which incorporated different versions of AWC's quotes. A&B accepted these quotes by submitting purchase orders. There is no evidence that AWC attempted to correct the error in the schedule at any point. AWC was the drafter of the language, so that language will be construed in favor of A&B.

## C.  AWC's Remedy

AWC is entitled to a cancellation fee of 100% based on the parties' contracts for $3,922,566.68 of valves for the Cheviot project that were complete and ready to ship, waiting on customer testing or inspection, ready for build assembly, or which were at some other stage in the manufacturing process when A&B instructed AWC to suspend pending orders.[9]  This amount covers valves that were ordered over ten weeks before the July 10th suspension.  AWC is entitled to a 50% cancellation fee for valves totaling $123,657.00 ordered less than ten weeks prior to the July 10th suspension.  This 50% cancellation fee totals $61,828.50.  The total cancellation fee owed AWC is $3,984,395.18.  This amount must be offset by the $1,000,000.00 paid by A&B in connection with the parties' partial settlement.  The cancellation fees must also be offset by the amount AWC recovered from Oliver Valves, totaling $249,380.29.  Finally, AWC is entitled to recover the storage costs that it paid Oliver with respect to the valves that were never delivered as a result of the July 10th suspension.  These storage fees totaled $132,000.00 (AWC's Facts at ¶¶ 57-59).  Factoring these amounts into the cancellation fees, AWC is entitled to recover **$2,867,014.89**.

## V.

## CONCLUSION

For the reasons stated above, the Court GRANTS AWC's motion for summary judgment [Doc. 14].  The Court DENIES the Trustee's cross-motion for summary judgment [Doc. 28], and motion to strike [Doc. 33].  As a result, AWC is entitled to a judgment of $2,867,014.89.  AWC

---

[9] Of this amount, $380,413.00 represented valves complete and ready to ship, $449,698.00 represented valves waiting on customer testing or inspection, $2,569,404.68 represented product ready for build assembly, and $523,051.00 represented product ordered but in some other build status.

shall prepare a judgment that reflects the Court's ruling herein.  This judgment shall be submitted within twenty-one (21) days of this Memorandum Ruling.

THUS DONE in Chambers on this ___19th___ day of September, 2019.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE